National Forge & Ordnance Company v. Commissioner.
National Forge & Ordnance Co. v. Commissioner
Docket No. 325.
United States Tax Court
1944 Tax Ct. Memo LEXIS 270; 3 T.C.M. (CCH) 418; T.C.M. (RIA) 44145; May 3, 1944
*270 F. W. Ries, Jr., Esq., 1150 Union Tr. Bldg., Pettsburgh, Pa., R. K. Conaway, C.P.A., 2912 Grant Bldg., Pittsburgh, Pa., and H. A. Mihills, C.P.A., for the petitioner. Homer F. Benson, Esq., for the respondent. SMITH Memorandum Findings of Fact and Opinion SMITH, Judge: This proceeding involves a deficiency in excess profits liability for 1935 under section 3 of the Vinson Act in the amount of $849.20. The only question in issue is whether a contract which petitioner made with the Secretary of the Navy in 1934 to furnish thirty gun barrel forgings of certain specifications was completed during 1935 when the forgings were provisionally accepted and delivered to the Navy Yard, or in 1938 when tests and final inspections conducted by the Navy Yard were satisfactorily completed and the forgings were finally accepted. The facts are stipulated. Findings of Fact Petitioner is a Delaware corporation with its principal place of business located at Irvine, Pennsylvania. In 1938 petitioner filed with the collector of internal revenue for the twenty-third district of Pennsylvania a report on form 937 in which it reported completion of Navy contract No. NOd621 at December 31, 1938, and the *271 realization thereon of excess profits in the amount of $849.17. The respondent has determined that the contract in question was completed during 1935 and that the excess profits thereon (in the amount of $849.20 as determined by him) should have been reported in 1935. Petitioner entered into Navy contract No. NOd621 on November 5, 1934, agreeing to furnish for the Navy thirty 5inch/38 Mark XII-1 gun barrel forgings in accordance with certain specifications for the manufacture of ordnance material for the United States Navy as contained in Ordnance Pamphlet No. 400, dated May 1932, and Ordnance Pamphlet No. 9, dated January 5, 1934. The forgings were to be delivered f.o.b. Navy Yard, Washington, D.C. The contract price was 23 cents per pound, the total contract price being $42,207.30. Payment was to be made "after final acceptance and delivery as stipulated in Article 1 of this contract." The said Article 1 provides in part as follows: "Article 1. Scope of this contract. - The contractor shall furnish and deliver thirty (30) 5inch/38 Mark XII-1 Gun Barrel Forgings, in strict accordance with Drawing No. 170025, dated June 22, 1933, and with Ordnance Pamphlets No. 400, dated May *272 1932, and No. 9, dated January 5, 1934, delivered f.o.b. Navy Yard, Washington, D.C., at 23 cents per pound, for the consideration stated above, in strict accordance with the specifications, schedules and drawings, all of which are made a part hereof and designated as follows: Schedule No. 161-Ord., Item No. 1, and the specifications and drawing listed above. "In accordance with Paragraph 113 of Ordinance Pamphlet No. 9, the date of release to the common carrier for shipment following provisional acceptance at contractor's works shall be considered as the contract date of delivery. "Deliveries shall be made as follows: Ten (10) forgings to be delivered within two months from date of this contract, and at least ten (10) forgings per month thereafter until completion." The contract further provided: "Article 4. Inspection. - (a) All material and workmanship shall be subject to inspection and test at all times and places and, when practicable, during manufacture. The Government shall have the right to reject articles which contain defective material or workmanship. Rejected articles shall be removed by and at the expense of the contractor promptly after notification of rejection. *273 * * * * *
"(c) Final inspection and acceptance of materials and finished articles will be made after delivery, unless otherwise stated. If final inspection is made at a point other than the premises of the contractor or a subcontractor, it shall be at the expense of the Government except for the value of samples used in case of rejection. Final inspection shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud. Final inspection and acceptance or rejection of the materials or supplies shall be made as promptly as practicable, but failure to inspect and accept or reject materials or supplies shall not impose liability on the Government for such materials or supplies as are not in accordance with the specifications. In the event public necessity requires the use of materials or supplies not conforming to the specifications, payment therefor shall be made at a proper reduction in price." The thirty forgings called for under the contract were manufactured by the petitioner at its plant at Irvine, Pennsylvania, and were "provisionally" accepted by the resident inspector for the Navy Department during 1935. They were shipped to the Navy *274 Yard at Washington, D.C., in two shipments of fifteen forgings each, one made on January 31, 1935, and the other on February 28, 1935. When delivered to the Navy the forgings or barrels were in an unfinished state. They had been forged, heat treated, rough bored and turned by petitioner. After their arrival at the Navy Yard they were all put through a series of refining operations and tests such as radial expanding, boring, rifling, finished boring, chambering, assembling and proof firing. Frequent inspections were made by Navy inspectors and petitioner was kept informed of the results as the work progressed. Petitioner kept a representative at the Washington Navy Yard to check and report on the progress of the work on the forgings. One of the conditions of the contract was that petitioner would replace at its own cost any forging finally rejected because of defects and would also bear the cost of any work done by the Navy on any forging found to contain defects causing its final rejection. On several different occasions during 1935 the Navy notified petitioner that minor defects had been found in one or more of the thirty forgings delivered and requested petitioner either to authorize *275 continuation of the work on these forgings or give its consent to their rejection at that time. Usally petitioner authorized continuation of the work. On September 11, 1935, petitioner accepted rejection of two defective forgings and on November 15, 1935, shipped two new forgings to replace them. On March 22, 1938, pursuant to the terms of the contract, petitioner paid the Navy Department $1,236.57 for work which it had performed on the two rejected forgings. Seven forgings were finally accepted by the Navy during 1935, twenty during 1936, and three during 1937. Petitioner received a payment on its contract of $21,103.65 on June 25, 1935. The remaining one-half of the total contract price was withheld by the Comptroller General of the United States on account of claims of the United States against the petitioner under another Navy contract not here involved. The action of the Comptroller General in withholding the payment was sustained by the Court of Claims of the United States in a case decided March 3, 1941, National Forge & Ordnance Co. v. United States, 93 Ct. Cl. 170. The cost to petitioner of performing contract NOd621 was $37,137.40 and *276 its net profit (total contract price of $42,207.30 less $37,137.40) was $5,069.90. Petitioner reported $849.17 (the excess of net profits over 10 percent of the total contract price) as excess profits of 1938. The respondent has determined that the contract was completed in 1935 and that the excess profits should have been reported in that year. The parties have stipulated that if it is decided in this proceeding that contract NOd621 was not completed during 1935 there is no deficiency in petitioner's excess profits liability for that year; also that if it is decided that the contract was completed during 1935 a credit of $159.22 should be deducted from the proposed deficiency of $849.20 on account of income and excess profits taxes paid on the profit in excess of 10 percent of the contract price of the contract, and that there is a deficiency of $689.98 under section 3 of the Vinson Act for the year 1935. We find as a fact on the evidence of record that Navy contract No. NOd621 was completed within the meaning of section 3 of the Vinson Act during 1935. Opinion Under section 3 (a) and (b) of the Vinson Act of March 27, 1934 (48 Stat. 503), as amended by the Act of June 25, 1936 *277 (49 Stat. 1926), every contractor procuring a Navy contract is required to agree: (a) To make a report, as hereinafter described, under oath, to the Secretary of the Navy upon the completion of the contract, and (b) To pay into the Treasury profit, as hereinafter provided shall be determined by the Treasury Department, in excess of 10 per centum of the total contract prices, of such contracts within the scope of this section as are completed by the particular contracting party within the income taxable year. * * * Under the original act as it existed prior to the amendment of June 25, 1936, the contractor was required to report the excess profit on each contract separately. By the amendment of June 25, 1936, the contractor was authorized to report the aggregate of the excess profits on all contracts completed within each income tax year beginning after December 31, 1935. Thus, as to contracts completed during 1936 and subsequent years the excess profit realized on one contract might be offset against the loss sustained on another. The amendment did not affect the question of the time of completion of the contracts. The regulations promulgated pursuant to section 3 of the Vinson *278 Act, as amended, approved by the Secretaries of the Treasury and the Navy (T.D. 4723, Cumulative Bulletin, 1937-1, p. 519), provide in part as follows: Art. 5. Measure of excess profit. - (a) Completion of contract defined. - The method of ascertaining the amount of excess profits in respect of a contract or subcontract coming within the scope of the Act depends upon the date of completion of the contract or subcontract (i.e., whether the contract or subcontract was completed prior to the contracting party's first income-taxable year beginning after December 31, 1935, or was completed within or subsequent to such income-taxable year). With the exception of those contracts which provide a method for determining the date of completion, the date of delivery of the vessel, aircraft or portion thereof covered by the contract or subcontract shall be considered the date of completion of the contract or subcontract unless otherwise determined by the Secretary of the Navy and the Secretary of the Treasury or their duly authorized representatives. * * * In I.T. 3089, Cumulative Bulletin 1937-1, p. 529, it was held: Where a contract or subcontract *279 under the Vinson Act, approved March 27, 1934 (48 Stat., 503), as amended by the Act of June 25, 1936 (49 Stat., 1926), does not provide a method for determining the date of completion thereof, the date of delivery of the articles specified in the contract or subcontract is considered the date of completion for the purposes of section 3 of the Act, regardless of whether full payment has been made or whether the guarantee period contained in the contract or subcontract has expired. The question of the year of completion of a Navy contract similar to that here involved was under consideration in Foster Wheeler Corporation, 42 B.T.A. 36. Under the contract there certain articles of equipment were manufactured and delivered to the Navy in 1935 and 90 percent of the contract price was paid to the contractor in that year. The remaining 10 percent was paid in 1936 after the equipment had been installed and satisfactorily tested aboard ship. We held that the contract was completed in 1935. Douglas Aircraft Co., Inc., 46 B.T.A. 1025, involved a Navy contract for two airplanes. We held that the contract was completed within the *280 meaning of section 3 of the Vinson Act in the year when the contractor's work was finished, the planes delivered to and accepted by the Navy Department, and 98 percent of the contract price paid to the contractor. The instant case differs somewhat from the cited cases in that here the articles furnished under the contract, the gun forgings, were in an unfinished state when delivered to the Navy and required further manufacturing before they could be finally tested and accepted by the Navy. However, this additional work on the forgings was done by the Navy, not the contractor, and at the Government's expense, except that petitioner was charged for all work done on forgings finally rejected because of defects. Out of the thirty forgings delivered to the Navy under petitioner's contract in 1935 two were rejected and replaced with new forgings at petitioner's expense. As to the remaining twenty-eight petitioner performed no services and bore no additional cost of manufacturing after they were accepted by and delivered to the Navy in 1935. It seems to us that as for petitioner's part the contract was completed in that year. Petitioner had then fully performed its part of the contract, *281 although it remained contingently liable for latent defects in the forgings. It was said in Foster Wheeler Corporation, supra, that it is the time of the completion of the contract by the contractor to which the Vinson Act refers. A fortiori, it is the time of completion of the contract and not the time of completion of the articles manufactured or supplied under the contract to which the statute is directed. It was not under any provision of the presently involved contract, NOd621, that one-half of the contract price was withheld from petitioner by the Comptroller General. That action was taken because of petitioner's liability to the United States Government under an earlier separate contract. This circumstance in no way affects our question here of the year of the completion of the contract now under consideration. The evidence here shows, we think, and we have found as a fact, that the contract under consideration was completed, within the meaning of section 3 of the Vinson Act, prior to December 31, 1935. Pursuant to the stipulation of the parties. Decision will be entered for the respondent in the amount of $689.98.